Minute Order Form (06/97)



# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 8589 | **DATE** | 6/29/2001 |
| **CASE TITLE** | Escatel vs. Atherton, et al. | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The Court grants defendant's motion for summary judgment [79-1] on plaintiff's Section 1983 claims (Counts I-III) and dismisses the pendent state law claims of Counts IV and V as to all defendants under 28 U.S.C. Section 1367(c)(3). The Court denies defendants' request for attorney fees, but costs shall be taxed against the plaintiff as provided at 28 U.S.C. Section 1920.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | JUL 0 2 2001 |
| ✓ | Docketing to mail notices. | date docketed |
| ✓ | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| | | date mailed notice |
| MD | courtroom deputy's initials | |

ED-7
FILED FOR DOCKETING

01 JUN 29 PM 3:34

Date/time received in central Clerk's Office

mailing deputy initials

Document Number

95

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RUMALDO ESCATEL, a minor, by Guadalupe Escatel, his mother and next friend,<br><br>    Plaintiff,<br><br>    v.<br><br>ROBERT ATHERTON, CHRISTINE BENSON, ANDREW WUJEK, JOAN SCHMIDT, CAROL RAMER, JOHN HARTT, HERMAN KREILING, DAN SHIREY, MICHAEL VERCIMAK and MENDOTA TOWNSHIP HIGH SCHOOL DISTRICT NO. 280,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 96 C 8589 |

DOCKETED
JUL 0 2 2001

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rumaldo Escatel, who is Mexican-American and a minor, by his mother, Guadalupe Escatel, brought this law suit pursuant to 42 U.S.C. §§ 1983 and 1988, alleging that defendants violated his procedural due process, substantive due process and equal protection rights under the Fourteenth Amendment to the United States Constitution, when they expelled him in November, 1996, from Mendota Township High School ("MTHS") for the remainder of the school year. Plaintiff also asserts pendent state law claims against the defendants for willful and wanton misconduct. All defendants (the principal of MTHS, the superintendent of schools, members of the board of MTHS District No. 280 ("Board"), and the school district) have moved

*85*

for summary judgment[1] on all claims. For the reasons set forth herein, the court grants the motion.

## FACTS[2]

On October 24, 1996, Rumaldo Escatel ("Rumaldo"), a sophomore at the time, was suspended for ten days from MTHS by the principal, Robert Atherton ("Atherton"), for alleged "gross misbehavior and misconduct." Specifically, he was found to have "made what the administration is determining as a weapon in his period 4 Power Technology Class" and "[t]his weapon was kicked, projected, or otherwise propelled down the cafeteria hallway during "C" Lunch on October 23rd and toward administrators, Atherton and Prusator." A letter from Atherton notified Rumaldo's parents of his proposal to expel Rumaldo and the opportunity to appeal the suspension, requested they attend a November 7, 1996 hearing on the proposed expulsion, and indicated that Atherton would cite Rumaldo as "being in violation of the policy as it appears in the Student Handbook and School District Policy 710.16." The 1996-1997 Student Handbook provided:

GENERAL DISCIPLINARY MEASURES

Students committing acts of disobedience or misconduct may be placed on probation, detained during non-school hours, assigned discipline points, assigned Saturday school, suspended from school, suspended from riding the school bus, expelled from school or otherwise disciplined. . . .

Students may be expelled from Mendota Township High School in accordance

---

[1] This is defendants' second motion for summary judgment. On April 9, 1998, defendants filed an Answer to Counts I, II and III and moved to dismiss counts IV and V. On May 19, 1998 defendants moved for summary judgment on Counts I-III. On March 15, 1999, the Honorable Joan B. Gottshall denied the motions without prejudice for failure to file a proper 12(M) (now Local Rule 56.1) statement.

[2] The facts as set forth herein, taken from the Second Amended Complaint, Answer and statements of material facts, are undisputed unless otherwise indicated.

2

with the provisions of the Illinois Code.

Offences which may be considered as constituting gross disobedience and/or
misconduct shall include, but are not limited to the following: . . . 7. Any
endangering of the physical or psychological well-being of school personnel or
other students by conduct or actions, including: . . . d. Possession, use or display
of a dangerous weapon or any reasonable facsimile. . . .

(Defs.' Ex. H at 12-14).  School District Policy 710.16 provides:

## STUDENTS

## RIGHTS AND RESPONSIBILITIES – WEAPONS

Possession, distribution, use . . . of . . . any other object that can reasonably be
considered a weapon shall be prohibited . . . in school buildings, or on school
grounds at all times.

* * *

Any students found to be in violation of this policy shall be expelled for at least
one year.  The School Board may direct the Superintendent to modify the
expulsion requirement on a case-by-case basis. . . .

(Defs.' Ex. J).

On November 7, 1996, an expulsion hearing was held in the office of Christine Benson

("Benson"), the superintendent of MTHS.  Rumaldo, his mother, and his attorney participated in

the hearing.  At the expulsion hearing, Rumaldo admitted making a knife in his Power

Technology Class, taking it to the cafeteria area and displaying it to people in the cafeteria area.[3]

---

[3]The relevant testimony from the expulsion hearing is as follows:

> Mr. Atherton: I would like to ask Rumaldo if he made the knife in shop class?
> Rumaldo: Yes. I did.
> Mr. Atherton: Did you take it into the cafeteria area?
> Rumaldo: Yes.
> Mr. Atherton: Did you show it to people in the cafeteria area?
> Rumaldo: Yes.

(Defs.' Ex. B, Transcript of November 7, 1996 Expulsion Hearing at 25).  Plaintiff objects to defendants' use of
Exhibit B, the expulsion hearing transcript, on the basis that the witnesses in the expulsion hearing were not sworn.
(continued...)

Rumaldo also contended that the teacher of the class was present in the classroom at all times, that he never intended to hurt anyone with the instrument, and that the instrument was never used to hurt anyone.[4]  Atherton admitted that Rumaldo did not kick, project or otherwise propel a weapon down the cafeteria hallway as alleged and he stipulated to the dismissal of this allegation. No evidence of any prior infraction by Rumaldo was offered at the expulsion hearing.  Atherton stated that he would recommend to the Board, at its next meeting on November 12, 1996, that Rumaldo be expelled from school for the remainder of the school year, which was for the remainder of the fall semester 1996 and the spring semester 1997.

On November 12, Rumaldo, his mother, and his attorney appeared at the Board meeting at the high school, but were told by Atherton that it was not necessary that they attend the

_____

[3](...continued)

However, since school administrators "are entitled to rely on traditional sources for the information on which they decide and act," *Wood* v. *Strickland*, 420 U.S. 308, 319 (1975) – in this case the expulsion hearing testimony – this court "has no basis in this action to question such reliance." *West* v. *Derby Unified Sch. Dist. #260*, 23 F. Supp. 2d 1223, 1230 (D. Kan. 1998) (federal court could consider unsworn statements of student witnesses upon which principal had relied). Further, plaintiff's statements are admissible under Federal Rule of Evidence 801(d)(2)(A) as party admissions. The court notes, however, that Exhibit B is not properly authenticated (by affidavit or certification). While it is not clear whether plaintiff is challenging Exhibit B on authentication grounds, *see* Pl.'s Resp. to Defs.' Statement of Facts ¶ 16, even if he is, the court finds that any lack of authentication is immaterial since defendants have also provided the court with a certified transcript of the preliminary injunction hearing held before Judge Gottschall on April 14, 1997, in which plaintiff's attorney admitted to these facts, without reservation, and Judge Gottschall on the expulsion hearing transcript and plaintiff's attorney's statements, deemed these facts admitted. (Defs.' Ex. A, Transcript of April 14, 1997 Temporary Restraining Order and Preliminary Injunction proceeding at 15-16).  *See CA 79-3511 St. Louis Baptist Temple, Inc.* v. *Fed. Dep. Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (on a motion for summary judgment a court may consider counsel's concessions of fact and take judicial notice of its own records, particularly a "court's own records of prior litigation closely related to the case before it"). Finally, plaintiff's reliance upon his 1998 deposition testimony in which he denies possessing the knife in the cafeteria area and showing it to other people there, *see* Pl.'s Additional Facts ¶¶ 2-3, is insufficient to create an issue of fact in light of his earlier admissions in the 1996 expulsion hearing and his attorney's admissions at the 1997 preliminary injunction hearing. *Cf. Piscione* v. *Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999) (not permitting plaintiff to create material issue of fact to defeat summary judgment by submitting an affidavit that contradicts earlier deposition); *see also Wood*, 420 U.S. at 326 (§ 1983 "does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings").

[4]Rumaldo admitted at his deposition that he did not have permission to make the instrument and that, to his knowledge, the Power Technology Class instructor did not know that Rumaldo was making the instrument. (Defs.' Ex. D, Rumaldo Dep. at 6-7).

meeting. After about two and a half hours, Rumaldo and his mother (but not his attorney) were

allowed to appear before the Board. After the meeting with Rumaldo and his mother, defendants

told them to leave the meeting room and to call Atherton the next morning for the Board's

decision. The morning of November 13, Rumaldo's mother called Atherton, who stated to her

that the Board had voted to expel Rumaldo for the remainder of the school year. Rumaldo was

given no credit for his courses during the fall and spring semesters. Defendants made no effort to

contact the regional superintendent of schools to determine whether Rumaldo could be placed in

an alternative school. In the several years prior to plaintiff's expulsion, all students at MTHS

who had been found in possession of what had been determined to be a weapon had been

expelled.[5] Other Mexican-American students have been expelled from MTHS.

On the same day that the Board voted to expel Rumaldo, the Board also voted to expel

Esat Aliu ("Esat"), who is caucasian[6] of Albanian descent and was a special education student[7] at

the time of the expulsion. Esat made wooden knuckles in the Power Technology Class, which

---

[5]Defendants assert that "In the past six years or so, all students at Mendota High School who have found to be in possession of what has been determined to be a weapon, have been expelled." (Defs.' Statement of Material Facts ¶ 30, citing Ex. F, Atherton Dep. [taken in 1998] at 54-55). Plaintiff disputes this fact with other portions of Atherton's testimony. However, the court finds that the other portions of Atherton's testimony are not inconsistent and do not raise a genuine issue of material fact. One would surmise that the documentation of this fact was discoverable, so plaintiff's failure to rebut with evidence suggests a lack of genuine dispute of fact. *See Bordelon* v. *Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 528 (7th Cir. 2000) ("denials must be made only if the material fact asserted is actually in dispute").

[6]While it appears defendants disagree with the characterization of Esat as "white" and assert that for "statutory purposes" Esat may be classified as "other," *see* Defs.' Resp. to Pl.'s Additional Statement of Facts ¶ 7, Atherton's deposition testimony to which defendants refer does not genuinely dispute Esat's characterization as white. In further answering the question as to Esat's race, Atherton states: "I guess based on the categories presented by the State of Illinois . . . he would be classified under white, non-Hispanic." (Defs.' Ex. F, Atherton Dep. at 31).

[7]Plaintiff disputes that Esat was a special education student, arguing that there is no affidavit or sworn testimony to support that assertion. *See* Pl.'s Resp. to Defs.' Statement of Facts ¶ 27. However, defendants did support their assertion with the deposition testimony of Atherton and Rumaldo, both of whom were sworn at their depositions, thus the court finds plaintiff's dispute to be without merit.

had not been taken out of the classroom.[8] Like Rumaldo, Esat was charged with having "made a device in his period 4 Power Technology Class that the Administration is classifying as a weapon," but in Esat's case, Atherton informed Esat's parents that he would recommend that Esat be expelled for the remainder of the semester. (*See* Pl.'s Resp., Atherton Dep. Ex. 12, October 25, 1996 letter to Esat's parents). Atherton considered Esat's offense to be severe. A Multi-Disciplinary Conference ("MDC") was held on October 30, 1996 regarding the relationship of Esat's special education disability to the offense of making wooden knuckles. The MDC found that Esat's misconduct was not related to his disability and that he was capable of following standard school rules and disciplinary policies.[9] The Board was made aware of the MDC's finding. Esat was expelled for the remainder of the fall semester, approximately 19.5 days. Esat was allowed to remain enrolled in some classes, was provided with educational services, and was allowed to continue earning credits. Esat, by his counsel, entered into a compromise agreement with the school district, with respect to Esat's attendance during the second semester, which provides:

---

[8]Plaintiff asserts that it can be inferred that Esat left the classroom with the wooden knuckles because Esat left the classroom. (*See* Pl.'s Resp. to Defs.' Statement of Facts ¶ 29, citing Defs.' Ex. D, Rumaldo Dep. at 17-18). However, there is nothing in the deposition testimony cited by plaintiff from which the court could reasonably infer that the wooden knuckles left the classroom. To the question, "To your knowledge did the knuckles that were made by those two students, did they ever leave the power technology class?" plaintiff's answer was non-responsive: " I know me and Assat [sic] did, but I don't know about Oscar Lemus." When subsequently pressed with the question, "Do you know if Assat [sic] was caught before he left the power technology class?" plaintiff answered, "Yeah, he was, yeah." (Defs.' Ex. D, Rumaldo Dep. at 17-18). Thus, the reasonable inference to be drawn from this testimony is that the wooden knuckles did *not* leave the classroom because Esat was caught *before* he left the classroom. Therefore, the testimony of Atherton that the "weapon [that Esat made], was not taken out of the classroom. It was not transported across the street. It did not end up at the feet of two administrators. . . . ," *see* Defs.' Ex. F, Further Cont. Atherton Dep. at 48, stands uncontradicted.

[9]The October 30, 1996 MDC summary report also noted in the "Review of Academic History and Current Educational Functioning" section that a pager was confiscated from Esat that he knew he shouldn't have had. (*See* Pl.'s Resp., Atherton Dep. Ex. 9). Plaintiff and defendants do not dispute that Esat could have been, but was not, expelled for possession of a pager.

> We, the undersigned parties, consisting of the student, parents of student, legal representative of student, and school official agree that during the second semester of the 1996-97 school year any of the offenses listed below will be grounds for Esat's immediate expulsion from school for the remainder of this semester with educational services being delivered, where appropriate and feasible, off the campus of Mendota Township High School. Therefore, the undersigned agree to waive the discipline code as it applies to the student body and recognize that violation of any one of the policies listed below will result in immediate expulsion.

(Pl.'s Resp., Atherton Dep. Ex. 10). After this paragraph, the agreement contains a list of offenses (apparently the same list of offenses listed on pages 12-14 of the Student Handbook) for which students could be suspended or expelled, but the provisions pertaining to non-prescription drugs, throwing snowballs and excessive absences were deleted and/or crossed out. The Board did not discuss the cases of *Washington* v. *Smith*, 618 N.E.2d 561 (Ill. App. Ct. 1993), *Robinson* v. *Oak Park and River Forest High Sch.*, 571 N.E.2d 931 (Ill. App. Ct. 1991), and *Doe* v. *Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200*, 1996 U.S. Dist. LEXIS 9741 (N.D. Ill. July 11, 1996), before they voted to expel Esat for the remainder of the semester and Rumaldo for the remainder of the academic year.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). In

7

response, the non-moving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.*, 477 U.S. at 324, 106 S. Ct. at 2553; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-599. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

## DISCUSSION

A.    <u>Federal Claims</u>

"A cause of action under § 1983 requires a plaintiff to demonstrate that he was deprived of a right secured by the Constitution or a federal law at the hand of someone acting under color of law." *Hanania* v. *Loren-Maltese*, 212 F.3d 353, 356 (7th Cir. 2000). In the school disciplinary context, the Supreme Court has admonished,

> It is not the role of the federal courts to set aside decisions of school
> administrators which the court may view as lacking a basis in wisdom and
> compassion. . . . The system of public education that has evolved in this Nation
> relies necessarily upon the discretion and judgment of school administrators and
> school board members and § 1983 was not intended to be a vehicle for federal
> court correction of errors in the exercise of that discretion which do not rise to the
> level of violations of specific constitutional guarantees.

*Wood* v. *Strickland*, 420 U.S. 308, 326 (1975); *see also Boucher* v. *Sch. Bd. of the Sch. Dist. of Greenfield*, 134 F.2d 821, 827 (7th Cir. 1998) ("The Supreme Court 'has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials,

consistent with the fundamental constitutional safeguards, to prescribe and control conduct in the schools.'") (quoting *Tinker* v. *Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 507 (1969)). Nowadays, sadly, the discretion and judgment that administrators might privately desire to exercise is often shaped in light of the potential for political, bureaucratic, media, and even violent consequences. Where weapons are concerned, fear in the community of school violence ignites fear in the administrators of being too lenient, and harsh judgments on the children involved may follow. Still, a harsh judgment is not necessarily a constitutional violation.

In his Second Amended Complaint, plaintiff asserts that he was wrongfully suspended and expelled from school and deprived of an education in violation of his constitutional right to procedural due process, right to substantive due process, right to be free from summary punishment,[10] right to equal protection and right to be free from race discrimination.[11] Plaintiff brings his claims against defendants Atherton, Benson and the board members, in their individual capacities (Count I) and in their official capacities (Count II); Count III is against the school district. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343(3) and (4).

1.    Procedural Due Process

A procedural due process claim must be based on a violation of a protected liberty or property interest. *See Goss* v. *Lopez*, 419 U.S. 565, 572-74 (1975). Suspension and expulsion

---

[7]Nowhere in plaintiff's response to the motion for summary judgment does he argue why his suspension (as opposed to his expulsion) was wrongful nor does he define "summary punishment." The court, therefore, assumes that plaintiff does not wish to pursue these arguments further, and therefore, has forfeited these points. *See United States* v. *Lanzotti*, 205 F.3d 951, 957 (7th Cir. 2000) ("[U]ndeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

[11]Because plaintiff does not make a race discrimination argument separate from his equal protection argument, the court construes the allegation as one claim, namely that he allegedly was discriminated on the basis of race (Mexican-American) in violation of the equal protection clause.

decisions implicate a property interest in the educational benefits provided by state-established and state-maintained schools and a liberty interest in one's reputation. *Id.* at 573-76. The court assumes for purposes of this motion that Illinois has created a protectable property interest in education and that Rumaldo has a liberty interest in his reputation. Therefore, the court must determine whether Rumaldo received the process he was due when he was expelled. While the Supreme Court has not definitively set forth the process due where expulsion is concerned, the Seventh Circuit has held that a student who is expelled must receive adequate notice of the charges, sufficient opportunity to prepare for a hearing, an orderly hearing, and a fair and impartial decision. *See Betts* v. *Bd. of Educ. of the City of Chicago*, 466 F.2d 629, 633 (7th Cir. 1972) (where expulsion is involved and is discretionary, and where student admits to misconduct with which she was charged, student is to be afforded "an opportunity to be heard on the question of what discipline is warranted by the identified offense" and "some opportunity to present a mitigative argument"); *Linwood* v. *Bd. of Educ. of the City of Peoria*, 463 F.2d 763, 770 (7th Cir. 1972) ("The hearing must be at a meaningful time and in a meaningful manner" but "[d]ue process in the [expulsion] context . . . is not to be equated . . . with that essential to a criminal trial or a juvenile court delinquency proceeding."); *Baxter* v. *Round Lake Area Schools*, 856 F. Supp. 438, 445 (N.D. Ill. 1994) (finding plaintiff was not denied due process in connection with expulsion hearing where plaintiffs were given adequate notice of the hearing, plaintiffs and their attorney attended the hearing and had adequate time to prepare for it, and plaintiffs' attorney was given an opportunity to explain plaintiff's position to hearing officer and to question school personnel).

Defendants argue that there is no disputed issue of fact that plaintiff received all the

process he was due, pointing out that he received notice, was allowed to participate in the expulsion hearing with his attorney, and that his attorney cross-examined defendants' witnesses and gave a closing argument. In response, plaintiff does not make any procedural due process argument save, perhaps, that "Rumaldo's attorney was not allowed to address the [Board] before they voted to expel Rumaldo," *see* Pl.'s Resp. Mem. at 10 (a one-line statement that is not even specifically identified as a procedural due process argument). Plaintiff's concern about having his attorney speak to the Board was addressed by the court in Judge Gottschall's opinion denying Rumaldo's request for a preliminary injunction and temporary restraining order, after a hearing on the motion on April 14, 1997, in which the court found with respect to his procedural due process claim, in relevant part:

> In the case at bar, plaintiff was interviewed by the school principal in the course of the principal's investigation of the knife incident. At this time, he did not deny that he had made the knife and displayed it in the cafeteria. Formal notice of an expulsion hearing was sent to the Escatel family almost two weeks in advance of the expulsion hearing. The charges were set forth in the notice as was a list of the witnesses on whom the administration intended to rely.

> On November 7, 1996, the expulsion hearing was held as scheduled. The hearing officer was an attorney from the law firm which represents the Board of Education. Rumaldo and his mother, Guadalupe Escatel, were present with counsel. Counsel was permitted to cross-examine, offer evidence and argument and object to evidence. Counsel, Mrs. Escatel and Rumaldo were given the opportunity to make arguments in mitigation. Pursuant to the Board's normal procedures and Illinois law, 105 ILCS 5/10-22.6(a), the hearing officer took evidence and prepared a summary of the evidence which was transmitted to the Board of Education.

> The Board is the ultimate decisionmaker, and the evidence indicated that it typically makes its decisions on the basis of such reports, without hearing live evidence. While the Escatels were discouraged from attending the Board meeting, they did attend and both Rumaldo and Mrs. Escatel were permitted to address the Board, although their attorney, who had accompanied them to the Board meeting, was not permitted to appear before the Board.

* * *

> Plaintiff also argues that he was entitled to a hearing before the Board. As events transpired, plaintiff and his mother appeared at the Board meeting where the issue of plaintiff's expulsion was being considered. The Board allowed plaintiff and his mother, but not plaintiff's counsel, to address the Board. Since the Board had a full summary of the evidence, and did in fact hear plaintiff and his mother in person, the Board's procedures, in this court's view, were adequate to ensure that the decisionmaker had all relevant evidence before it.

*Escatel* v. *Atherton*, 1997 WL 264345, **2-3 (N.D. Ill. May 8, 1997). Because plaintiff has not brought forth any additional evidence or argument regarding a procedural due process violation, and because the court is satisfied on the record before it, as was Judge Gottschall, that plaintiff received constitutionally adequate procedural due process, the court finds that defendants are entitled to summary judgment on plaintiff's procedural due process claim.

    2.   <u>Substantive Due Process</u>

    "The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington* v. *Glucksberg*, 521 U.S. 702, 719 (1997). It provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* at 720. Where no fundamental right is involved, the government action will be upheld if it has "a reasonable relation to a legitimate state interest." *Id.* at 722. On a plaintiff's challenge to an executive decision (as opposed to the government's procedures themselves), the Supreme Court requires a threshold inquiry before even reaching the *Glucksberg* fundamental rights analysis, and that is whether the "behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento* v. *Lewis*, 523 U.S. 833, 847 n.8 (1998) (the reason for requiring a different test is that "executive action challenges raise a particular need to preserve

the constitutional proportions of constitutional claims, lest the Constitution be demoted to what

we have called a font of tort law"). Only if there is egregious behavior, "would there be a

possibility of recognizing a substantive due process right to be free of such executive action." *Id.*

Whether the government action is legislative or executive, though, the "touchstone of due

process is protection of the individual against arbitrary action of government." *Id.* at 845-46.

*See also Dunn* v. *Fairfield Community High Sch. Dist. No. 225*, 158 F.2d 962, 965 (7th Cir. 1998)

("[S]ubstantive due process on either the legislative or the executive side requires an

extraordinary departure from established norms.").[12]

      In the instant case, it is not clear from plaintiff's opposition brief whether he is attacking

the administrators' decision to expel him or the school disciplinary rules and policies.[13] In any

event, the court finds that under either prong of attack, plaintiff's claim fails. While expulsion

for the remainder of the year was a severe punishment, the court finds that plaintiff's expulsion is

not sufficiently "shocking" to the conscience to violate due process.[14] Plaintiff has admitted

---

    [12]While the Seventh Circuit has applied the Supreme Court's *Lewis* dual approach in the school disciplinary context, *see Dunn*, 158 F.3d at 966, in a subsequent case it seemed to limit the application of the *Lewis* test to circumstances such as "a high-speed [police] chase where government officials had to make split-second decisions" as in *Lewis*, or a pre-trial detainee claiming inadequate medical treatment. *See* Khan v. *Gallitano*, 180 F.3d 829, 836 (7th Cir. 1999). Because the Seventh Circuit has not clarified this apparent discrepancy, the court analyzes plaintiff's claim under both inquires.

    [13]The only argument plaintiff makes on this point is that

      . . . defendants' disciplinary policy is 'wholly arbitrary' . . . Witness the wholesale rewriting of the
      disciplinary code to prevent Esat's expulsion for various offenses that mandated expulsion for all
      other students, and the failure to expel Esat for possession of the pager. . . . The treatment
      Rumaldo received in comparison to Esat was arbitrary and does 'shock the conscience.'

*See* Pl.'s Resp. Mem. at 12. The court construes this argument as a form of his equal protection argument and addresses it below.

    [14]The Supreme Court has not made clear whether the "shocks the conscience" analysis is normally a question for the jury or whether it is a question of law for the court. *See* Matthew D. Umhofer, CONFUSING

(continued...)

making a knife, taking it to the cafeteria area and displaying it to other students. The defendants'

determination that what he made was a weapon is not erroneous and certainly not arbitrary.[15]

And the undisputed evidence in this case is that in the few years prior to plaintiff's expulsion, all

students at MTHS who had been found in possession of what had been determined to be a

weapon had been expelled. The arbitrariness, or shocking nature of the expulsion, is even less

apparent where, as here, the administrators relied on school rules that had been distributed to the

school community, rather than simply pronounced in reaction to the plaintiff's conduct.[16] These

rules were consistent with Illinois law in effect at the time permitting expulsion for "gross

disobedience or misconduct" and providing for expulsion for no less than a year (which could be

modified on a case by case basis) for bringing a weapon – including a knife or "look-alike" – to a

school activity. 105 ILCS 5/10-22.6(a) & (d) (effective through July 1, 1997). Therefore, in

light of the defendants' compliance with their announced policies, and the deference to be given

to school administrators under doctrines set out above, this court concludes that the defendants'

---

[14](...continued)
PURSUITS: SACRAMENTO V. LEWIS AND THE FUTURE OF SUBSTANTIVE DUE PROCESS IN THE EXECUTIVE SETTING, 41 Santa Clara L. Rev. 437, 469-70 (2001) ("[T]he shocks the conscience test necessarily raises the question of whose [conscience] is being shocked. Is it the judge's conscience? The jury's? . . . Remarkably, this question has never been answered directly by the Supreme Court."). The Seventh Circuit has said that it is a question of law. *Armstrong* v. *Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998) ("Because this inquiry ultimately defines the parameters of the Fourteenth Amendment, we approach the subject as a question of law."). Other courts have indicated it is a decision for the court, not the jury, to decide. *See, e.g.,Uhlrig* v. *Harder*, 64 F.3d 567, 573 (10th Cir. 1995); *Doe* v. *Beaumont I.S.D.*, 8 F. Supp. 2d 596, 605 (S.D. Tex. 1998).

[15]Although plaintiff disputes that what he made is a weapon and asserts instead that it was a dull instrument, *see* Pl.'s Additional Facts ¶ 1, citing Def.'s Ex. D, Rumaldo Dep. at 6-7, as this court has already indicated, *see supra* note 3, it is not for the court to relitigate or second-guess the administrator's conclusions. The evidence in the record demonstrates to the court that the administrators' determination was not arbitrary. *See Nash* v. *Auburn Univ.*, 621 F. Supp. 948, 958 (M.D. Ala. 1985) ("This Court is not to retry plaintiffs' case. Its role is only to determine whether enough evidence against plaintiffs was presented to the Board to foreclose a determination that the Board's decision was arbitrary or capricious.") (citing *Wood*, 420 U.S. at 326).

[16]Plaintiff concedes that defendants relied on the Student Handbook in expelling him. (*See* Sec. Am. Compl. ¶¶ 30-31).

discipline was not so arbitrary as to shock the conscience. *See Dunn*, 158 F.2d at 965 (affirming summary judgment to defendants reasoning that it would be "nearly absurd" to find that a principal's decision to deny students participation in Band class for the remainder of the school year for playing unauthorized musical pieces would be sufficiently "shocking" to satisfy substantive due process standards); *see also Bundick* v. *Bay City Indep. Sch. Dist.*, 140 F. Supp. 2d 735, 741 (S.D. Tex. 2001) (granting summary judgment to defendants for expelling student for the remainder of the semester where illegal knife was discovered in a toolbox in student's truck reasoning that where state law prohibited such conduct, "[d]efendants obedience to state law prohibits any argument, much less a finding, that their disciplinary decision was arbitrary, capricious, irrational or inconsistent with the educational goals of the school.").

Assuming plaintiff is also challenging the school rules and policies, the court finds that they do not violate substantive due process under the *Glucksberg* analysis. Given that there is no fundamental right to an education, the defendants' policy permitting expulsion must be sustained if it is rationally related to a legitimate state interest. *Glucksberg*, 521 U.S. at 722. Plaintiff does not contend that the school policies disserve a legitimate school purpose in protecting the school and maintaining order and discipline. *See* 1996-97 Student Handbook at 11 ("Reasonable rules and regulations developed and enforced by the administration, teachers, and parents are necessary for the orderly protection of the school, for the maintenance of a good learning environment, and for the ultimate development of self-discipline."); *cf. Boucher*, 134 F.3d at 827 ("Without first establishing discipline and maintaining order, teachers cannot begin to educate their students.") (quoting *New Jersey* v. *T.L.O.*, 469 U.S. 325, 350 (1985)) (Powell, J., concurring). Moreover, as already noted, plaintiff has admitted to engaging in the prohibited conduct. The court finds that

plaintiff's expulsion for possession and display of a weapon is rationally related to the legitimate purpose of orderly protection of the school and maintaining order. *See Dunn*, 158 F.3d at 966 (affirming summary judgment to defendants reasoning that school policy did not violate substantive due process where plaintiffs "conceded that they had violated a school rule, that the rule was designed to preserve discipline in the classroom and to punish student insubordination, and that these were legitimate interests on the part of the school district"); *cf. James* v. *Unified Sch. Dist. No. 512, Johnson County, Kansas*, 899 F. Supp. 530, 534 (D. Kan. 1995) (denying a temporary restraining order to require student to take final exams or be awarded grades earned through date of expulsion and be allowed to attend school during next school year, where student was expelled for the remainder of the 1994-95 school year effective April 28, 1995 and for the first semester of the 1995-96 school year for possessing a gun on school property, reasoning that schools have a legitimate interest in keeping weapons out of schools and there was a rational relationship between the offense and the penalty); *Petrey* v. *Flaugher*, 505 F. Supp. 1087, 1092 (E.D. Ky. 1981) (dismissing complaint where high school student was expelled pursuant to state law and school practice for remainder of year for first offense of violating drug policy by smoking marijuana). Therefore, the court will grant summary judgment in favor of defendants on plaintiff's substantive due process claim.[17]

---

[17]In one part of his Additional Facts, plaintiff asserts that "[t]he school handbook assigns 10-15 points for a contraband violation and 3-10 points for endangering well being. Possession of a weapon could constitute a contraband violation or endangering well being. The penalty for a contraband violation or endangering well being is a warning conference and counseling. A student doesn't know from the handbook whether possession of a weapon will be considered a contraband violation or endangering well-being or considered under another section of the handbook involving possession of a weapon which can result in expulsion." (*See* Pl.'s Additional Facts ¶ 23, citing Defs.' Ex. F, Atherton Dep. at 47-52). Plaintiff makes no substantive due process argument–or any argument–based on these provisions. Even if he did, the court finds that the Student Handbook gives a student fair notice that possession of a weapon could warrant several different disciplinary actions, including suspension and expulsion and
(continued...)

### 3.  Equal Protection

Plaintiff's primary claim of a constitutional violation is that he was denied equal protection of the laws on the basis of race and because he is Mexican-American. To establish an equal protection violation, plaintiff must show that the challenged conduct had a discriminatory effect and was motivated by a discriminatory purpose. *Chavez* v. *Illinois State Police*, 251 F.3d 612, 2001 WL 543707, *16 (7th Cir. 2001) (citing *Personnel Adm'r of Mass.* v. *Feeney*, 442 U.S. 256, 272-74 (1979); *Arlington Heights* v. *Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-66 (1977); *Washington* v. *Davis*, 426 U.S. 229, 239-42 (1976)). The court examines each element separately.

#### a.  Discriminatory Effect

To prove discriminatory effect, plaintiff is required to show that he is a member of a protected class, that he is otherwise similarly situated to members of the unprotected class, and that he was treated differently from members of the unprotected class. *Id.* (citing *Greer* v. *Amesqua*, 212 F.3d 358, 370 (7th Cir.), *cert. denied*, — U.S. —, 121 S. Ct. 568, 148 L. Ed. 2d 487 (2000); *Johnson* v. *City of Fort Wayne, Ind.*, 91 F.3d 922, 944-45 (7th Cir. 1996)). Plaintiff may show that defendants treated him differently from similarly situated individuals of the

---

[17](...continued)
creates no expectation that it would only result in discipline points or discipline points first. The Student Handbook (a complete copy of which is present in the court's file) states that "Discipline points . . . *may* be imposed for student disobedience or *misconduct warranting less penalties*,"and "Disciplinary action *may* include, *depending on the nature of the conduct*, any of the following: warning, parent conference, discipline points, Saturday School, 1 to 10 days Out-of-School *Suspension*, police referral, expulsion warning and/or *expulsion proceedings*." (*See* 1996-97 Student Handbook at 14, 17) (emphases added). Judge Gottshall already rejected a similar argument. *See Escatel*, 1997 WL 264345, at *3 (rejecting plaintiff's argument "made for the first time in [his] post-hearing brief, that the handbook provided only for 'discipline points,' leading up to detention, for his conduct. The handbook makes very clear that the administration can consider the seriousness of an offense in determining whether to treat it pursuant to the point system.").

unprotected class by either naming such individuals or through the use of statistics. *Id.* (citing *United States* v. *Armstrong*, 517 U.S. 456, 467 (1996)). In this case, plaintiff does not rely on statistics, but rather points to another student, Esat, who is caucasian, and asserts that despite having engaged in the same conduct as Esat, plaintiff was disciplined more severely. Plaintiff asserts that both he and Esat made an instrument in class that Atherton determined to be a weapon, but that plaintiff was expelled for the remainder of the school year and did not receive educational services or course credit during his expulsion, whereas Esat was expelled only to the end of the fall semester of 1996 (19.5 days), was provided instruction by defendants during the fall semester of his expulsion and received credit at the end of the fall semester for the courses he was taking.[18]

To determine whether Rumaldo was similarly situated to Esat, the court "must look to all relevant factors, the number of which depends on the context of the case." *Id.* at *17 (noting that the requirement must not be "too narrowly" defined). The court is to make a common-sense inquiry, which is "essentially factual [in] nature," into whether plaintiff has demonstrated that he shares "common features essential to a meaningful comparison." *Id.* Defendants point to two principal differences between Esat's and Rumaldo's situation that they assert justified the differences in treatment. The first is that Esat is a special education student and plaintiff is not.[19]

_____

[18]Plaintiff's original claim of discrimination was based only on the differing lengths of time that plaintiff and Esat were expelled. (*See* Sec. Am. Compl. ¶ 35). Plaintiff now asserts that as a result of discovery the basis for the claim has expanded to include allegations that Esat was provided educational benefits during his expulsion, whereas plaintiff was not, and requests leave to amend his complaint. (*See* Pl.'s Resp. to Defs.' Statement of Facts ¶ 24). The court has considered, in this opinion, the evidence pertaining to provision of educational services and denies plaintiff's request to amend as futile.

[19]Plaintiff argues that defendants' assertion that plaintiff is not a special education student should be stricken because it is not based on affidavit or sworn testimony. (*See* Pl.'s Resp. to Defs.' Statement of Facts ¶ 27).
(continued...)

Illinois law provides, "Expulsion or suspension shall be construed in a manner consistent with the Federal Individuals with Disabilities Education Act [20 U.S.C. § 1400 *et seq.*]." 105 ILCS 5/10-22.6(d). At the time of plaintiff's and Esat's expulsions, the Individuals with Disabilities Education Act ("IDEA") provided that in order for state and local education agencies to receive federal financial assistance for the education of disabled students, the state must, *inter alia*, "[assure] all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1) (Supp. 1996). Defendants assert that the IDEA mandated Esat be provided alternative education upon expulsion unlike a regular education student and note that the IDEA has had a history of literal interpretation. Plaintiff contends that defendants' reliance upon the IDEA is pretextual and points to case law at the time which held that if there had been a determination that a student's misconduct was not related to his disability, then the IDEA did not require the school to provide educational services to the student upon expulsion. Plaintiff cites to one unpublished case decided before the Esat's expulsion took place, *Doe v. Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200*, 1996 U.S. Dist. LEXIS 9741, *3 (N.D. Ill. July 11, 1996) (relying on *Doe v. Maher*, 793 F.2d 1470, 1482 (9th Cir. 1986), *aff'd as modified sub nom.*, *Honig v. Doe*, 484 U.S. 305 (1988)). The issue here is not whether defendants correctly understood their obligations to a special education student, but whether Esat's *status* as a special education student justified their taking a different path as to him.[20] The court finds that it does.

---

[19](...continued)
However, plaintiff directs the court to no evidence that would suggest that it is actually a disputed fact whether plaintiff was a special education student. *See Bordelon*, 233 F.3d at 528 ("denials must be made only if the material fact asserted is actually in dispute").

[20]In any event, the law was not settled at the time, at least one circuit and the Department of Education interpretation supported defendants' view of literal interpretation and the Seventh Circuit had yet to rule on the issue.
(continued...)

The evidence is uncontroverted that after Esat's offense occurred, the defendants promptly

convened the MDC. This action was on its face taken because Esat was a special education

student, in other words, this was their basis for classifying Esat differently from Rumaldo. And

although plaintiff also points out that under the Illinois School Code, 105 ILCS 5/10-22.6(d),[21] he

also could have been placed in an alternative school program, he does not seem to argue that this

discretionary provision made him similarly situated to Esat.

The second difference relied upon by defendants, less convincing, is that Rumaldo's

conduct was more dangerous in that Esat's wooden knuckles never left the classroom (because

they were intercepted by a teacher, plaintiff points out), but Rumaldo removed the knife from the

classroom, took it to the cafeteria area and showed it to other students. Ultimately, the knife was

propelled in the direction of two school administrators (although not by plaintiff). Plaintiff notes,

---

[20](...continued)

The Seventh Circuit did not affirm the district court opinion upon which plaintiff relies until several months after the expulsion decision, see Doe v. Bd. of Education of Oak Park & River Forest High Sch. Dist. 200, 115 F.3d 1273 (7th Cir. May 27, 1997), and, at the time of plaintiff's expulsion, there was at least one circuit, the Fourth Circuit, which held, in accordance with the Department of Education interpretation of the IDEA, that provision of educational services was required regardless of whether the misconduct warranting expulsion was related to the disability. See Virginia v. Riley, 86 F.3d 1337 (4th Cir. June 19, 1996) ("Riley II"). Later, the Fourth Circuit reversed itself in Virginia v. Riley, 106 F.3d 559 (4th Cir. Feb. 5, 1997) ("Riley III"), and it was this opinion that the Seventh Circuit partially relied on in affirming in Oak Park. The Seventh Circuit also observed that there was dicta in the Fifth and Sixth Circuits as well as in a 1982 district court opinion in Illinois that followed the literal view. See Oak Park, 115 F.3d at 1278-79, n.3. Moreover, shortly after the Seventh Circuit opinion was issued, Congress amended the statute and made clear that states eligible for funds have in effect policies to ensure that "[a] free public appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school," 20 U.S.C. § 1412(a)(1) (emphasis added), which supports defendants' position. See Oak Park, 115 F.3d at 1283 (in an Addendum to its opinion, on June 23, 1997, the Seventh Circuit recognized that the amendment's effect would be to lead to a different result in its original decision affirming the district court but held that the amendment was not retroactive). Although defendants appear to rely primarily on the amended version of the statute in their brief, the court does not consider this to be material since the pre-amendment version had a history of literal interpretation.

[21] 105 ILCS 5/10-22.6(d) (". . . A student who is subject to suspension or expulsion as provided in this Section may be eligible for a transfer to an alternative school program in accordance with Article 13A of the School Code [the Safe Schools Law, 105 ILCS 5/13A-0.5 et seq.]. . . .") (emphasis added); see also 105 ILCS 5/13A-4 ("A student who is determined to be subject to suspension or expulsion in the manner provided by Section 10-22.6 . . . may be immediately transferred to the alternative program.") (effective August 18, 1995) (emphasis added).

however, that Esat was found in possession of a pager for which he could have been expelled but was not.[22] Plaintiff also asserts that Esat made more than one weapon; however, evidence of this is unclear from the deposition testimony to which plaintiff refers, and at best would seem to only suggest that there was a trial set of wooden knuckles made, and there is no suggestion that either the trial set or actual wooden knuckles were taken out of the classroom.[23] Nevertheless, cognizant of not interpreting the similarly situated requirement "too narrowly," the court does not expect plaintiff to find a perfectly identical situation of a non-Mexican-American student. Although the court agrees with defendants that Rumaldo's conduct was more dangerous than Esat's conduct, if these were the only differences, without Esat's special education status, the court would have difficulty resting a conclusion that the two students were not similarly situated on this comparison alone. Both made items in shop class that could do bodily harm to others, both had the apparent intention of taking them out of the classroom although one was intercepted. That aside, however, because there is no issue of fact with respect to the special education justification, the court finds that Rumaldo and Esat were not similarly situated.[24]

---

[22]See note 3 *supra.*

[23]In the deposition testimony cited by plaintiff, *see* Pl.'s Additional Facts ¶ 4, citing Defs.' Ex. D, Rumaldo Dep. at 16-18, Rumaldo states, "the next day or I think two days, I don't know, Assat [sic] made another weapon and then he got caught with it." Yet, the only other instrument discussed in this context concerned the knife that had been propelled in the direction of the administrators, which Rumaldo admitted to making. (*See* Rumaldo Dep. at 11-16). As to Atherton's deposition testimony that two sets of wooden knuckles were made, Defs.' Ex. F, Atherton Dep. at 37, Atherton testified that one was "maybe a trial set," and plaintiff has not argued that this trial set was taken out of the classroom.

[24]An exhibit to plaintiff's response memorandum is the summary of Esat's expulsion hearing, prepared by James S. Peters, the Board of Education Hearing Officer and an attorney, states: "Mr. Atherton explained why the Administration was requesting that the expulsion be for the remainder of this semester only. He noted the special needs of the Student. He noted that the item had not been taken out of the classroom. He noted that the extent of time in which the Student had possession of the weapon was minimal." (Pl.'s Resp., Atherton Dep. Ex. 5 at 6). Also, Judge Gottschall had the following to say in her opinion on the preliminary injunction motion: "Plaintiff's contention that he was singled out for unusually severe punishment because he is Mexican-American was unproven.

(continued...)

*Compare Chavez*, 2001 WL 543707, at *18 (finding that Hispanic and white motorists who both drove down the same stretch of the interstate at the same time and neither committed a traffic violation, were similarly situated for purposes of a traffic stop, and that distinguishing factors did not prevent them from being similarly situated where although white motorist was female, the defendants could not "legally decide whom to stop on the basis of gender" and there was no evidence in record that defendants based their decision to stop plaintiff on other distinguishing factors such as that his car was red or he had California license plates).

      b.   <u>Discriminatory Intent</u>

      Even if this court were to find that plaintiff and Esat were similarly situated, and that defendants' conduct had a discriminatory effect on him, he must still prove discriminatory intent. In this regard, he must "show that the 'decisionmakers in [his] case acted with discriminatory purpose.'" *Id.* at *25. "'Discriminatory purpose' . . . implies more than . . . intent as awareness

---

[24](...continued)
Plaintiff's only evidence in support of this allegation was evidence that a caucasian student, who had made wooden knuckles in shop class at about the time plaintiff made his knife, was expelled for only the duration of the first semester. At the preliminary injunction hearing, the school principal explained that the student with the wooden knuckles was a special education student, and that the legal requirements for educating such students influenced his decision to impose lesser discipline. Plaintiff did not succeed in demonstrating that this explanation was unworthy of credence or pretextual. Given the difference between a knife and wooden knuckles, and the evidence that the school feels obligated to treat special education students differently from regular students, the evidence as it currently stands is insufficient to suggest race or ethnic discrimination." *See Escatel*, 1997 WL 264345, at *3. The transcript from the preliminary injunction hearing provides, in part:

    Q: And was the term of the expulsion the same as Rumaldo's, to the end of the school year?

    A: (Atherton) The term of the expulsion was adjusted due to the young man's handicapping condition. The young man was in Special Education and he is afforded other rights that go beyond regular education students.

(Defs.' Reply to Mot. Summ. J. Ex. A (2d part) at 5). Plaintiff has not directed the court to any new evidence that Judge Gottschall did not hear, and the court is satisfied, as was Judge Gottschall, that the evidence is insufficient to suggest defendants' reasons were pretextual.

of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group.'" *Id.* (quoting *McCleskey* v. *Kemp*, 481 U.S. 279, 292 (1987) (quoting *Feeney*, 442 U.S. at 279)). Thus, to carry his burden, plaintiff must prove that he was disciplined more severely because the defendants were motivated by a discriminatory intent. There is really no evidence in this case that would permit the conclusion that defendants disciplined Rumaldo more severely because of the effects on Mexican-Americans or, stated slightly differently, because of bias against Mexican-Americans. Again, plaintiff relies on the evidence that the Board did not determine the law before deciding and the finding that the offense was not related to Esat's disability to demonstrate racial bias. But, as indicated above, this evidence does not point to that conclusion. Rather, it points to the veracity of the defendants' assertion that Esat's special education status motivated them in shaping Esat's discipline, a factor not present for Rumaldo. Plaintiff also suggests that the fact that Atherton said he was going to recommend expulsion for the remainder of the semester for Esat, *before* the MDC's finding of unrelatedness had occurred, creates an inference of discriminatory intent. The evidence of what motivated Atherton at the beginning of the process is not developed and the court will not speculate. That Esat was allowed to enter into an agreement, which altered some of the provisions of the student handbook with respect to Esat, also fails to raise an inference of discrimination for the reason discussed above that the Esat's special education status was the reason for the provision for alternative education for him.[25]

---

[25]As explained by Atherton in the testimony cited by plaintiff, the agreement was entered into because Esat was a special education student: "Q: Have you ever done an agreement like this with any other students? A: I don't know we ever expelled any other special education student. So I don't know that that would apply." (Defs.' Ex. F. Further Cont. Atherton Dep. at 30). He also explained that the reason that certain provisions were taken out was because the agreement made the discipline more severe if Esat violated them and they did not want more minor

(continued...)

Moreover, defendants have noted that plaintiff, who also had an attorney, chose to challenge the expulsion rather than attempt to negotiate a settlement with the school district, as Esat's counsel did. Although plaintiff asserts that defendants made no effort to contact the regional superintendent of schools to determine whether Rumaldo could be placed in an alternative school program pursuant to Illinois School Code, 105 ILCS 5/10-22.6(d), plaintiff does not explicitly argue that this is evidence of discriminatory intent, and even if he did, plaintiff has not submitted any evidence that would suggest the decision not to transfer him to an alternative school program as opposed to out-of-school expulsion in this case was discriminatory, e.g. by showing that other non-Mexican-American students were given alternative education after expulsion. Finally, plaintiff's submission of the general fact that other Mexican-American students have been expelled from MTHS does not establish a material issue of fact as to discrimination without some showing that these students are disproportionately expelled in relation to their numbers in the school. Whether or not this court agrees with the approach of the defendants in the ultimate resolution of the two student expulsions, it concludes there is insufficient evidence upon which to base an inference that plaintiff's race or national origin motivated their decisions. *See Smith* v. *Town of Eaton, Indiana*, 910 F.2d 1469, 1472 (7th Cir. 1990) ("An equal protection claim must be based on 'intentional discrimination against [the plaintiff] because of his membership in a particular class, not merely [because] he was treated unfairly as an individual.'"). Therefore, defendants are entitled to summary judgment on plaintiff's equal protection claim.

---

[25](...continued)
violations such as possible possession of non-prescription drugs (i.e. aspirin) or snowball throwing or excessive absences to result in immediate expulsion. (*See id.* at 30-36). Thus, the school's agreement with Esat actually creates the reverse inference in that, for the most part, it made the penalties against Esat *more* severe than as applied to other students since it makes him subject to *immediate* expulsion for engaging most of the conduct listed therein.

B.    State Claims

Because the court finds for the defendants on their federal claims, it will dismiss the state law claims under 28 U.S.C. § 1367(c)(3).

C.    Attorneys' Fees

Defendants have requested costs and attorneys fees.  In an action to enforce 42 U.S.C. § 1983, "the court in its discretion, may allow the prevailing party, . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.  However, a prevailing party is entitled to attorney's fees only if the plaintiff's claim was "frivolous, unreasonable, or groundless." *Khan*, 180 F.3d at 837 (quoting *Christiansburg Garmet Co.* v. *EEOC*, 434 U.S. 412, 422 (1978)).  The court denies defendants' request.  The claims asserted in this case sought to preserve plaintiff's educational opportunity for nearly an entire school year, a significant loss to him.  Although the Supreme Court does not recognize education as a fundamental interest under the Constitution, education is certainly an interest the society values highly, and the Constitution does require that school administrators not act arbitrarily.   That plaintiff was expelled for nearly an entire academic year for a first offense is arguably arbitrary, and to so argue was not frivolous. *See id.* ("There is a significant difference in making a weak argument with little chance of success . . . and making a frivolous argument with no chance of success.  As the courts have interpreted § 1988, it is only the latter that permits defendants to recover attorneys' fees.") (citation omitted).

## CONCLUSION

For the reasons stated above, the court grants defendants' motion for summary judgment [#79] on plaintiff's § 1983 claims (Counts I-III) and dismisses the pendent state law claims of Counts IV and V as to all defendants under 28 U.S.C. § 1367(c)(3).  The court denies defendants'

request for attorneys fees, but costs shall be taxed against the plaintiff as provided at 28 U.S.C. §

1920.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: June 29, 2001